IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARCIA GLEN WHITE and <br> ROBERT CHARLES LADD, <br>    Plaintiffs, <br><br> vs. <br><br> BRAD LIVINGSTON, <br> Executive Director, <br> Texas Department of Criminal <br> Justice, <br><br> WILLIAM STEPHENS, <br> Director, Correctional <br> Institutions Division, <br> Texas Department of Criminal <br> Justice, <br><br> JAMES JONES, <br> Senior Warden, Huntsville Unit <br> Huntsville, Texas, <br><br> and <br><br> UNKNOWN <br> EXECUTIONERS, <br>    Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. <br> _____ <br><br><br><br> DEATH PENALTY CASES <br><br><br> GARCIA GLEN WHITE <br> IS SCHEDULED <br> FOR EXECUTION <br> JANUARY 28, 2015; <br><br> ROBERT CHARLES LADD <br> IS SCHEDULED <br> FOR EXECUTION <br> JANUARY 29, 2015 |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**INTRODUCTION**

     Late in the day on January 23, 2015, the United States Supreme Court granted *certiorari* in the matter of *Glossip v. Gross*, No. 14-7955, 574 U.S. ___ (Jan. 23, 2015), a case out of Oklahoma challenging that state's method of execution by lethal injection. The Order stated only "the petition for a

1

writ of certiorari [is] granted." The *Glossip* Petition presented the following questions:

> **Question 1:** Is it constitutionally permissible for a state to carry out an execution using a three-drug protocol where (a) there is a well-established scientific consensus that the first drug has no pain relieving properties and cannot reliably produce deep, comalike unconsciousness, and (b) it is undisputed that there is a substantial, constitutionally unacceptable risk of pain and suffering from the administration of the second and third drugs when a prisoner is conscious.
>
> **Question 2:** Does the *Baze*-plurality stay standard apply when states are not using a protocol substantially similar to the one that this Court considered in *Baze*?
>
> **Question 3:** Must a prisoner establish the availability of an alternative drug formula even if the state's lethal-injection protocol, as properly administered, will violate the Eighth Amendment?

Both question two and three have been central to all prior Texas lethal injection litigation, and this Circuit's rejection of same. *See Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013).

On Monday, January 26, the Oklahoma Attorney General filed a Motion for Stay of Execution of the three *Glossip* plaintiffs. See *Glossip v. Gross*, No. 14-7955, 574 U.S. ___ (filed Jan. 26, 2015).

Of the five executions scheduled to be carried out in the United States in the next two weeks, four of them are in Texas. The current protocol of the Texas Department of Criminal Justice (TDCJ) calls for the injection of the drug pentobarbital. *See* Exhibit A. As in Oklahoma, this is a far cry from the protocol and challenges before the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008). Upon information and belief, Defendants have enough compounded pentobarbital to carry out four or five more executions – assumedly including plaintiffs' executions. *See* Exhibits B, C, D, E. However, plaintiffs have substantial and valid concerns that those remaining drugs are no longer viable, and will cause excruciating pain. Moreover, Defendants have also recently purchased large quantities of midazolam, hydromorphone, and potassium chloride. *See* Exhibit C, E. Midazolam is

one of the drugs used in Oklahoma, and is at central issue in the *Glossip* case. Both midazolam and hydromorphone have been used in the worst of the botched executions that have taken place over the last year. If Defendants' highly questionable and limited supply of compounded pentobarbital cannot be used, plaintiffs assert that they will be subjected to the same drug or drugs that are at issue in Glossip, and at the heart of the most horrifically botched executions that have taken place over the past year.

THUS, Plaintiffs GARCIA GLEN WHITE and ROBERT LADD, prisoners on Texas' death row, move this Court for entry of judgment in their favor against the Texas Department of Criminal Justice and in support plead as follows:

## NATURE OF THE ACTION

1. This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations of the right of plaintiffs to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs seek injunctive relief.

## PLAINTIFFS

2. Plaintiffs Garcia Glen White and Robert Ladd are persons within the jurisdiction of the State of Texas. Both are death-sentenced inmates under the supervision of the Texas Department of Criminal Justice, confined at the Polunsky Unit in Livingston, Texas. Mr. White is scheduled for execution January 28, 2015; Mr. Ladd is scheduled for execution January 29, 2015.

## DEFENDANTS

3. Defendant Brad Livingston is the Executive Director of the Texas Department of Criminal Justice ("TDCJ").

4. Defendant William Stephens is the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice ("TDCJ"), and holds the power, by statute, to determine and supervise the manner by which death sentenced inmates are executed. Tex. Code Crim. Proc. art. 43.14.

5. Defendant James Jones is the Senior Warden of the Huntsville Unit, where executions take place.

6. Assistant Attorney General Edward Marshall has identified himself as counsel for all Defendants. He has been served via email transmission to Edward.Marshall@texasattorneygeneral.gov.

7. Defendants Unknown Executioners are employed by the Texas Department of Criminal Justice and carry out executions in Texas. Plaintiffs do not yet know their identities because the TDCJ conceals them.

8. The Defendants are all state officials acting, in all respects relevant to this action, under color of state law. They are all sued in their official capacities.

## JURISDICTION & VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201 (declaratory relief), and 2202 (further relief). This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

10. Venue in this Court is proper under 28 U.S.C. § 1391, and this Court has personal jurisdiction over the defendants in this matter because the events giving rise to this claim – both executions and the procurement and maintenance of drugs used in the lethal injection process – occur in Huntsville, Texas.

## EXHAUSTION OF REMEDIES

11. Plaintiffs submit that exhaustion is not required, as there is no administrative procedure available to address the issues raised herein.

## FACTUAL ALLEGATIONS

**The Relevance of the Grant of Certiorari in *Glossip*, Texas' Extremely Limited Supply of Questionable Compounded Pentobarbital, and Their Recent Purchases of Midazolam and Hydromorphone**

4

12. Prior challenges to Texas' lethal injection process took place prior to the grant of *certiorari* in *Glossip*.

13. The second and third questions presented in the *Glossip* petition reflect the issue that has been at the center of all prior Texas lethal injection litigation. Defendants' previous arguments and prior decisions of the Fifth Circuit Court of Appeals rejecting lethal injection challenges by Texas condemned inmates have relied in significant part on the application of the stay standard articulated by the plurality in *Baze*, including the requirement that plaintiffs challenging present day lethal injection methods must present an alternative method of execution. *See, e.g., Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013).

14. There is a national shortage of pentobarbital. The raw ingredient (Active Pharmaceutical Ingredient, or "API") necessary to make compounded pentobarbital is, upon information and belief, not available for purchase in the United States. The increasing shortages heighten concerns about the quality and legality of the source from which TDCJ is purchasing its drugs, and about the quality and viability of the drugs in TDCJ's possession.

15. TDCJ's supply of compounded pentobarbital has been diminishing; current supplies are only sufficient to carry out four to five more executions – if no back-up vials are consumed in the interim, and if no other mishaps or late discovered inadequacies befall the few vials left.

16. TDCJ's supply of compounded pentobarbital over the past six months has been in constant flux, with vials coming and going in odd increments, with unexplained returns and exchanges. *See* Exhibits C, D, and E. This adds to concerns about the adequacy, purity, and viability of the drugs TDCJ intends to use to execute plaintiffs.

17. Drugs that are compromised, contaminated, expired, or sub-potent would cause plaintiffs excruciating pain. *See* Affidavit of Larry Sasich, Exhibit G, para. 25, 30; 33, 46; Affidavit of Dr. David Waisel, Exhibit H, paras. 6-14.[1]

---

[1] The affidavits of Larry Sasich and Dr. Waisel were obtained in conjunction with prior litigation. They thus address specifics as to Woodlands Pharmacy, PCCA, and Eagle Laboratories that may (or may not) be relevant to these proceedings. However, the affidavits also provide ample details about the risks of compounding pharmacies and compounded drugs more generally. Given the emergency nature of

5

18. Defendants have exhibited deceptive behavior – including on federal forms required for the purchase of controlled substances - in their actions surrounding the purchase of execution drugs. Defendants varied, evasive, and dilatory responses to requests for information further exemplify Defendants' deceptive practices. *See infra*; Exhibits B and D.

19. Upon information and belief, TDCJ will not beable to purchase additional compounded pentobarbital, and will thus be forced to change their protocol, assumedly to one which uses the other lethal drugs they have so amply amassed: midazolam, hydromorphone, and / or potassium chloride.

20. There is no requirement that TDCJ give notice of a change in its execution protocol. There is nothing to ensure that Defendants will not be forced to or choose to change its protocol and administer a different drug or drugs (midazolam and or hydromorphone or potassium chloride) to carry out plaintiffs' executions.

**The Botched Executions**

21. Recent executions shed light on the substantial risk of serious harm that execution drug failure can cause.

22. In October 2012, in South Dakota, Eric Robert was executed using compounded pentobarbital. Witnesses reported that he "appeared to clear his throat and gasp heavily, at which point his skin turned a blue-purplish hue. Mr. Robert opened his eyes and they remained open until his death, and his heart continued beating for 10 minutes after he ceased to breathe." [2]

23. Twelve seconds into his January 9, 2014 execution in Oklahoma, which utilized a three-drug cocktail that included pentobarbital obtained from an unnamed compounding pharmacy, Michael Lee Wilson uttered his chilling final words: "I feel my whole body burning." It is highly likely that the tortured execution of Mr. Wilson resulted from contaminated, sub-potent, or

---

these proceedings, plaintiffs did not have time to obtain more recent expert affidavits.

[2] Missouri Execution: pharmacy will not supply compounded pentobarbital, The Guardian, Feb. 17, 2014, available here:
http://www.theguardian.com/world/2014/feb/18/missouri-execution-pharmacy-will-not-supply-compounded-pentobarbital.

otherwise sub-par drugs. As expert pharmacologist Larry D. Sasich, PharmD, MPH, FASHP stated: "It is my opinion that Mr. Wilson's reaction is consistent with contaminated pentobarbital sodium injection."[3]

24. A week later, on January 16, 2014, Ohio executed Dennis McGuire with a combination of drugs never before used in lethal injection in the United States – midazolam and hydromorphone - and he "struggled, made guttural noises, gasped for air and choked for about 10 minutes."[4]

25. On April 29th, 2014, midazolam, vecuronium bromide (a paralytic), and potassium chloride were administered – at least in part - to Clayton Lockett in Oklahoma. After he was declared unconscious, he began to speak, raised his head, writhed, groaned and took 43 minutes to die, reportedly from a heart attack. Midway through these horrific events, the prison drew the blinds on the execution chamber, obscuring what really happened from public scrutiny.[5]

26. On July 23rd 2014, it took Arizona death row inmate Joseph Wood nearly two hours to die after he was injected – over fifteen times - with midazolam and hydromorphone.[6]

27. The Supreme Court's grant of certiorari in *Glossip* was made in the context of these horrific events, and Oklahoma's continued insistence on the use of midazolam, a paralytic, and potassium chloride.

**Courts in Texas and Around the Country have Expressed Grave Concerns about these Events.**

28. The grant of *certiorari* in *Glossip* clearly reflects the high courts' concern over the constitutionality of the method of execution at issue there, and the

---

[3] Rick Lyman, *Ohio Execution Using Untested Drug Cocktail Renews the Debate over Lethal Injections*, New York Times, Jan. 17, 2014, at A15.
[4] Alan Johnson, *Inmate's Death Called 'Horrific' Under New, 2-Drug Execution*, The Columbus Dispatch, Jan. 17, 2014.
[5] Katie Freckland, *Clayton Lockett writhed and groaned. After 43 minutes, he was declared dead*, The Guardian, April 30, 2014, available at http://www.theguardian.com/world/2014/apr/30/clayton-lockett-oklahoma-execution-witness.
[6] Michael Muskal, *How did Arizona Execution go Wrong*, L.A. TIMES, July 24, 2014.

7

appropriate standard by which to evaluate such methods in the current landscape.

29. The Court's concerns were presaged by courts around the county. Texas courts expressed concerns about Texas' behavior and practices, and the increasingly fraught lethal injection landscape. Judge Gilmore, in granting Plaintiffs' Motion for Temporary Restraining Order, stated:

> Without some detail about the source of the drugs and the integrity of the testing, Plaintiffs are prevented from raising a specific Eighth Amendment challenge to their executions. Until Plaintiffs have full disclosure of the produce with which Texas will cause their death, they cannot fully develop a challenge to its process The question is not whether some error may cause a significant chance of pain in the execution procedure, but whether even a properly conducted execution will result in intolerable pain because of the substance used.

*Sells v. Livingston*, No. 4:14-cv-00832 (S.D.Tex. April 2, 2014), slip op. at p.5, reversed by *Sells v. Livingston*, 561 Fed. Appx. 342 (5th Cir. 2014).

30. Although District Court Judge Ellison felt bound by Circuit precedent and thus denied Mr. Robert Campbell's Motion for a Temporary Restraining Order, he stated:

> Troublingly, though, in sanctioning the State's refusal to disclose potentially relevant information, Fifth Circuit case law appears to leave the inmate with nothing but speculation to rely on.
> . . . .
> The horrific narrative of Oklahoma's botched execution of Clayton Lockett on April 29, 2014 requires sober reflection on the manner in which this nation administers the ultimate punishment. While the law currently does not permit injunctive relief, this Court urges the Fifth Circuit to reconsider its jurisprudence that seems to shield crucial elements of the execution process from open inquiry.

*Campbell v. Livingston*, No. 4:14-cv-01241 (S.D.Tex. May 9, 2014), slip op. at 2-3.

31. In Missouri, Judge Bye, dissenting from denial of rehearing, eloquently expressed his concerns:

8

> Missouri continues to frustrate the efforts of inmates such as Rousan to investigate the method of execution the State plans to use to end their lives. Missouri shields these shadow pharmacies—and itself—behind the hangman's cloak by refusing to disclose pertinent information to the inmates. This Court is largely left to speculate as to the source and quality of the compounded pentobarbital—or whatever chemical cocktail du jour Missouri elects to serve this time around. So long as Missouri insists on carrying out executions, it is fundamentally important the State is sufficiently transparent about its protocol to allow adequate review of the constitutionality of its chosen method.

*Zink v. Lombardi,* 2014 WL 16478528 (C.A.8 (MO.)) (Bye, J., dissenting).

32. From a different perspective, Judge Kozinski, dissenting from denial of rehearing en banc, stated forcefully:

> Whatever happens to Wood, the attacks will not stop and for a simple reason: The enterprise is flawed. Using drugs meant for individuals with medical needs to carry out executions is a misguided effort to mask the brutality of executions by making them look serene and peaceful—like something any one of us might experience in our final moments. *See Callins v. Collins*, 510 U.S. 1141, 1143 (1994) (Scalia, J., concurring in denial of certiorari) ("How enviable a quiet death by lethal injection . . . ."). But executions are, in fact, nothing like that. They are brutal, savage events, and nothing the state tries to do can mask that reality. Nor should it. If we as a society want to carry out executions, we should be willing to face the fact that the state is committing a horrendous brutality on our behalf.
> 
>     If some states and the federal government wish to continue carrying out the death penalty, they must turn away from this misguided path and return to more primitive—and foolproof—methods of execution. The guillotine is probably best but seems inconsistent with our national ethos. And the electric chair, hanging and the gas chamber are each subject to occasional mishaps. The firing squad strikes me as the most promising.
> . . . .
> While I believe the state should and will prevail in this case, I don't

9

understand why the game is worth the candle. A tremendous number of taxpayer dollars have gone into defending a procedure that is inherently flawed and ultimately doomed to failure. If the state wishes to continue carrying out executions, it would be better to own up that using drugs is a mistake and come up with something that will work, instead.

*Wood v. Ryan*, No. 14-16310 (8th Cir. July 21, 2014) (AZ) (Kozinski, J., dissenting to denial of rehearing en banc.

33. Numerous other courts have expressed concerns about the efficacy and constitutionality of lethal injections in the current landscape, about states' determination to avoid transparency, and about the risk that inmates will face torturous executions forbidden by the Eighth Amendment. *See, e.g.*, *Arthur v. Thomas*, 2013 WL 5434694 (M.D. Ala. Sept. 30, 2013) (allowing Eighth Amendment claims against execution protocol to proceed); *In re: Ohio Execution Protocol Litigation*, No. 2:11-cv-1016 (Order of May 27, 2104, staying all further executions to permit adjudication of adequacy of new execution protocol); *Schad v. Brewer*, No. 13-02001-ROS (D. Ariz. Oct. 5, 2013) (disclosing that state supply of pentobarbital expired in November 2013); *Hobbs v. Jones*, 412 S.W.3d 844 (Ark. 2012) (finding execution protocol in violation of state constitution); *Sims v. Dep't of Corr. & Rehab.*, 157 Cal. Rptr. 3d 409 (Cal. Ct. App. 2013) (finding execution protocol in violation of state law); *Baze v. Thompson*, No. 06-CI-574 (Franklin Cir. Ct. Dec. 5, 2013) (denying state's motion to lift injunction against executions); *State v. Irick*, No. M1987-00131-SC-DPE-DD (Tenn. Dec. 11, 2013) (staying execution so constitutionality of new execution protocol could be evaluated).

**Defendants Have Been and Continue to be Secretive, Dilatory and Obstructionist, Refusing To Provide Any But The Most Minimal and Ultimately Meaningless Information, Despite a Recent Ruling of a Texas Court that Defendants are not Entitled to Withhold Information Regarding the Drugs they Use to Carry Out Executions.**

34. On December 12, 2014, the 201st Judicial District Court of Travis County granted summary judgment in favor of plaintiffs, finding that the decision of the Texas Attorney General that TDCJ was entitled to withhold information about the source of lethal injection drugs was in error. *See* Exhibit F. TDCJ

10

is appealing that decision, and has consistently sought dilatory requests for opinions from the Attorney General in response to every request they receive for information about the lethal injection drugs.

35. A representative sampling of TDCJ's responses to various Public Information Act requests, and the email correspondence accompanying same, where available, are attached as Exhibits B, C, D, and E. The correspondence reflected in Exhibits B and D display the dilatory and obfuscating nature of TDCJ's responses to such requests. Despite impending execution dates, Defendants consistently utilize the full ten days allotted under the Texas Public Information Act before replying, taking advantage of every holiday and weekday available to them. *See Id*. Despite requests that they share what limited information they reveal via electronic means, they send it via the U.S. Postal service. *Id*. Despite the fact that the requests specifically state – in the interest of expediency - that they are not seeking information protected by the Public Information Act, TDCJ requests an Attorney General Opinion regarding the very information the requestors have specified they are *not* seeking. *Id.*

36. The limited responsive information provided is often nonresponsive to the specific inmate's request, or simply meaningless. Thus, for example, the information provided in response to counsel for Mr. Rodney Reed – scheduled for execution on March 3, 2015 – lists expiration dates for the drugs purchased in April and July 2014 – despite the fact that records provided also reflect that the vials received in April must have already been consumed or returned to the supplier, that there were vials received in May for which Defendants do not provide a beyond use date, that vials received in July will likely be consumed by the time of Mr. Reed's scheduled execution, and Defendant's do not provide a beyond use date for additional drugs received in October 2014. *See* Exhibit E, pp. 2-4.

**Texas' Conduct In Purchasing Lethal Injection Drugs Has Been Marked By Secrecy And Deceptive Practices.**

37. TDCJ purchases its drug supplies using a purchase order stating that the drugs are for and to be delivered to the "Huntsville Unit Hospital," with a street address matching that of the Huntsville Unit. *See, e.g.* Exhibit C, p.2.

11

The Huntsville Unit Hospital has not existed since 1983.[7]

38. The DEA Form 222[8] TDCJ uses to purchase its execution drugs states that the registered agent is "TDCJ, Huntsville Unit Hospital," a "hospital/clinic." The last time TDCJ renewed their DEA registration – in November 2011, they removed "Huntsville Unit Hospital" from the registration form. The Form 222 TDCJ currently uses is thus false. *See* Exhibit B, pp. 13, 16; Exhibit C, pp. 19-22; Exhibit D, p. 9; Exhibit E, p. 11-15.

39. The last known supplier of execution drugs was the Woodlands Pharmacy. After their name was revealed, Woodlands wrote a letter to a member of the Texas Board of Criminal Justice and various officials within the Texas Department of Criminal Justice, asking for return of their drugs. In the letter, Woodland Pharmacy states that a representative of TDCJ made statements leading to the "belief that this information would be kept on the 'down low' and that it was unlikely that it would be discovered that my pharmacy provided these drugs."[9] TDCJ refused to return the drugs as requested.

40. Use of a false DEA Form 222 and Purchase Order forms provides cover to pharmacies that can only legally provide controlled substances to a medical facility pursuant to a doctor's prescription.

41. Keeping information on the down low, and concealing as much information as possible about the source and quality of the drugs precludes scrutiny of the quality of the supplier, the API, and the drugs themselves.

**There is a Substantial Risk that the Method by Which Texas Intends to Carry out Plaintiffs' Execution will Result in a Torturous Death.**

42. In light of the dwindling supplies and sources for pentobarbital, there is a substantial likelihood that the drugs Defendants intend to use to carry out

---

[7] *See* Raimer, Ben and Stobo, John, *Health Care Delivery in the Texas Prison System*, JAMA, July 28, 2004 – Vol. 292, No. 4 at 486-487.

[8] A form reflecting the purchaser's registration with the DEA authorizing purchase of controlled substances.

[9] *See* Brandi Grissom, TDCJ Refuses to Return Execution Drugs to Pharmacist, Texas Tribune (Oct. 7, 2013), available here: https://www.texastribune.org/2013/10/07/tdcj-refuses-return-execution-drugs-pharmacist/ . TDCJ refused to return the drugs as Woodlands requested. *Id.*

Plaintiffs' executions are not viable, are expired, contaminated, or otherwise compromised. *See* Exhibit G.

43. Records provided by Defendants' reflect that the drugs they intend to use to carry out plaintiffs' executions are not the same as those used in previous executions. *See* Exhibits B – E. Each batch of drugs purchased is separately compounded, likely with a different API. There is no reason to think that the reliability and safety of the state's pentobarbital from batch to batch or execution to execution is the same. Exhibit G paras. 23-24. To the contrary, in the current landscape there is good reason to think the quality has declined. *Id.* at 19-23.

44. The unorthodox sequences of purchases and returns, the known shortage of the API necessary to make compounded pentobarbital, and TDCJ's secretive and deceptive actions, all give rise to grave questions about the adequacy of the drugs with which Defendants intend to carry out Plaintiffs' execution.

45. Drugs that are compromised, contaminated, expired, or sub-potent could cause plaintiffs excruciating pain in violation of the 8th Amendment. *See* Affidavit of Larry Sasich, Exhibit G, para. 25, 30; 33, 46; Affidavit of Dr. David Waisel, Exhibit H, paras. 6-14.[10]

46. Defendants have never provided anything other than the redacted lab sheets of a subpar laboratory reflecting insufficient and minimal testing as purported assurance of some aspects of the potency and purity of a small part of an unidentified batch of lethal drugs which may or may not be from the same batch used in plaintiffs' executions. *See* Exhibit I at paras. 34-35.

47. Defendants have never provided anything other than the bald and undocumented and unsupported assertions of their general counsel with respected to the beyond use date of the drugs purportedly to be used in planned executions. *See, e.g.*, Ex. D, p.3; Ex. E, p. 3.

---

[10] The affidavits of Larry Sasich and Dr. Waisel were obtained in conjunction with prior litigation. They thus address specifics as to Woodlands Pharmacy, Eagle Laboratories and other matters that may (or may not) be relevant to these proceedings. Nonetheless, the affidavits provide ample details about the risks of compounding pharmacies and compounded drugs more generally. Given the emergency nature of these proceedings, plaintiffs did not have time to obtain more recent expert affidavits.

13

48. If Defendants are forced to turn to the alternative drugs they have on hand – including midazolam - this matter falls squarely within the parameters of the *Glossip* case pending before the Supreme Court. As the first question in the *Glossip* petition reflects, there is a scientific consensus that midazolam cannot reliably produce the deep unconsciousness necessary to ensure that administration of the subsequent drugs (here, hydromorphone and / or potassium chloride) will not cause excruciating pain.

## LEGAL CLAIM

**There is a Grave and Unnecessary Risk that Plaintiffs will Suffer Excruciating Pain during the Execution Process, in Violation of the Eighth Amendment to the United States Constitution.**

49. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraph 1 through 48.

50. The Eighth Amendment prohibits cruel and unusual punishments and is applicable to the states through the Fourteenth Amendment. Thus, the states may not carry out executions in a manner that produces an "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). *See also Louisiana ex. Rel. Francis v. Resweher*, 329 U.S. 459, 463 (1984) (prohibition includes the "infliction of unnecessary pain in the execution of a death sentence."). Thus, in *Baze v. Rees,* the Supreme Court concluded that without the initial administration of a sedative, the injection of pancuronium bromide (a paralytic) and potassium chloride (which stops the heart) would present a "substantial, constitutionally unacceptable risk of suffocation." *Id*., 552 U.S. 35, 53 (2008).

51. "[S]ubjecting individuals to a risk of future harm – not simply actually inflicting pain – can qualify as cruel and unusual punishment. *Id.* at 49. Accordingly, a condemned inmate may file suit in state or federal court to enjoin his executions on the basis of such an Eighth Amendment challenge. *See, e.g. Baze v. Rees, supra; Hill v. McDonough*, 547 U.S. 573 (2006) (holding that Eighth Amendment challenge to lethal injection may be brought pursuant to 42 U.S.C. § 1983).

52. Because it is impossible to determine with certainty whether an inmate will suffer from unnecessary pain during an execution before that execution

occurs, the question of whether a particular execution procedure will inflict unnecessary pain involves an inquiry as to whether the inmate is "subject an unnecessary *risk* of constitutional pain or suffering." *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004) (emphasis added); *Fierro v. Gomez*, 77 F.3d 301, 307 (9th Cir. 1996) ("Campbell also made clear that the method of execution must be considered in terms of the risk of pain."); *Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir. 1994).

53. A medical or quasi-medical procedure inherently carries a risk that a mistake or accident might cause unforeseen pain; therefore, the Eighth Amendment does not require executioners to eliminate all possible risks of pain or accidents from their execution protocols. *See Reswebers*, 329 U.S. at 464; *Campbell*, 18 F.3d at 687. The Eighth Amendment does, however, prohibit the *unnecessary* risk of pain.

54. Plaintiffs assert that Defendants actions, extremely limited supply of compounded pentobarbital that runs a grave risk of being unviable, contaminated, or beyond its use date, and stockpiling of alternative execution drugs, including midazolam, combines to expose him to a grave risk of unnecessary pain and torture. This risk is neither unforeseen nor dependent on accident; it is foreseeable and documented by scientific evidence and expert opinion.

55. By virtue of the above stated facts and law, Defendants, in carrying out the execution of Plaintiffs, will deprive him of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment in violation of 42 U.S.C. § 1983.

### **PRAYER FOR RELIEF**

1. Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiffs until such time as Defendants can demonstrate the integrity and legality of any and all controlled substances they intend to use for Plaintiffs' execution;

2. Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them, from executing Plaintiffs until such time as Defendants can demonstrate that measures are in place to allow for Plaintiffs' execution in a manner that complies with the Eighth Amendment to the United States Constitution;

3. Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them, from executing Plaintiffs until such time as they have been given the opportunity to assess the constitutionality of the manner and means by which Defendants intend to execute them, and present evidence and testimony regarding same.

4. A declaration that Defendants' actions violate Plaintiffs' Eighth and Fourteenth Amendment rights;

5. Any other such relief as this Court deems just and proper.

6. Plaintiffs also requests that this Court grant reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States, as well as for costs of suit.

Dated this 27th day of January, 2015.

Respectfully Submitted,

*/s/ Maurie Levin*
Maurie Levin
Attorney at Law
Texas Bar No. 00789452
614 South 4th Street, #346
Philadelphia PA  19147
(512) 294-1540 - Telephone
(215) 733-9225 – Facsimile
maurielevin@gmail.com

*/s/ Patrick McCann*
Patrick F. McCann
Texas Bar #00792680
Law Offices of Patrick F. McCann
909 Texas Ave, Ste. 205
Houston, Texas 77002
713-223-3805
713-226-8097 Fax

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and forgoing Pleading has been forwarded to counsel for the defendants by electronic delivery to:

Edward Marshall
Fredericka Sargent
Jay Clendenin
Post-Conviction Litigation
Office of the Attorney General
Edward.Marshall@texasattorneygeneral.gov
Fredericka.Sargent@texasattorneygeneral.gov
Jay.Clendenin@texasattorneygeneral.gov

Attorneys for Defendants

*/s/ Maurie Levin*
Maurie Levin